CV 10 1397

Steven A. Morelli (SM-4721)
Eric S. Tilton (ET-9547), *Of Counsel*
The Law Office of Steven A. Morelli, P.C.
One Old Country Road, Ste. 347
Carle Place, New York 11514
(516) 393-9151

*Attorneys for Plaintiffs,*

```
FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★   MAR 29 2010   ★

LONG ISLAND OFFICE

SEYBERT, J.

LINDSAY, M.
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
RAYMOND SMITH,

                          Plaintiff,

     -against -

COUNTY OF SUFFOLK, and RICHARD DORMER
Individually and in his Official Capacity as
Suffolk County Police Commissioner,

                        Defendants.
-------------------------------------------------------------------X

**COMPLAINT**

*Jury Trial Demanded*

       Plaintiff RAYMOND SMITH, by and through his attorneys, THE LAW OFFICE OF STEVEN A. MORELLI, P.C., respectfully alleges, upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

**PRELIMINARY STATEMENT**

1.    Plaintiff ("Mr. Smith") is a 52-year-old former police lieutenant who loyally served the Suffolk County Police Department ("The Department") for more than 27 years. In 2007, Mr. Smith used his office computer to discuss two highly controversial issues with members of the news media and others.

2. At some time, and by some method unknown to Mr. Smith, the Department became aware of these communications. The Defendants thereafter unlawfully retaliated against him for exercising his First Amendment right to free speech by launching a full-scale Internal Affairs investigation, serving him with disciplinary charges, re-assigning him to a lower paying administrative position, suspending him without pay, and eventually forcing him into retirement.

3. As more fully set forth below, Defendants' investigation and subsequent retaliatory acts violated Mr. Smith's right to free speech under the First Amendment of the U.S. Constitution, and under Article I, § 8 of the New York State Constitution.

## JURISDICTION AND VENUE

4. This Court has original jurisdiction over Plaintiff's federal claim pursuant to 28 U.S.C. §§ 1331 & 1343. This Court has supplemental jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367 because the state claim is so related to the federal claim that they form a part of the same case or controversy between Plaintiff and Defendants.

5. Venue is proper in this case pursuant to 28 U.S.C. § 1391 because (1) the Defendants reside in Suffolk County, which is located in the Eastern District of New York, and (2) the events which give rise to Mr. Smith's claims took place in Suffolk County, New York, which is located in the Eastern District of New York.

## PARTIES

6. Plaintiff RAYMOND SMITH was and still is a resident and domiciliary of the County of Suffolk and State of New York. At all relevant times, Mr. Smith was a public employee of Suffolk County and the Suffolk County Police Department.

7. Defendant SUFFOLK COUNTY ("the County"), at all relevant times, was and still is a municipal corporation incorporated under the laws of the State of New York, with its principal place of business located at 225 Rabro Drive East, Hauppauge, New York 11788. The County administers and operates the Suffolk County Police Department, the agency by which Plaintiff was employed.

8. Defendant RICHARD DORMER, at all relevant times, was and still is the Police Commissioner of the Suffolk County Police Department, and is responsible for the government, administration, disposition and discipline of its members. Upon information and belief, Dormer is a resident and domiciliary of the County of Suffolk and State of New York.

## FACTUAL ALLEGATIONS

9. On January 2, 1981, Mr. Smith began working for the Suffolk County Police Department. On that date, he was sworn in and assigned to the Police Academy. Upon graduation from the Academy, his first assignment was as a patrol officer in

the County's 4th precinct. For the next 27 years, Mr. Smith faithfully served his community.

10. In 1986, Mr. Smith was promoted to Sergeant. In 1992, he was promoted to Lieutenant, which is the rank he held until he was forced into retirement by the Defendants in 2008. At the time of the events described herein, Mr. Smith was assigned to the Sixth Precinct in Selden, New York as a patrol lieutenant.

11. As Lieutenant in the Department's Patrol Division, Mr. Smith was responsible for the day-to-day supervision of a "squad" consisting of sergeants and police officers. Specific duties included, but were not limited to, notifying officers of special problems to be given attention during a particular shift, planning for upcoming events in the community, responding to complaints from citizens, coordinating activities with other squads and precincts, and preparing computerized crime reports.

12. As a Patrol Lieutenant, Mr. Smith was expected to spend a portion of his time on motor patrol. The amount of time spent on patrol was left to his discretion but all Patrol Lieutenants were expected to spend the majority of their on-duty time in the Duty Lieutenants' office at their respective precincts.

13. At all times relevant to this matter, the upper-level management of the Sixth Precinct consisted of an "Inspector" who was the precinct commander, a "Deputy

Inspector" who was second in command, and a "Captain" who was the immediate supervisor of the five patrol lieutenants.

14. The official policy of the Department with regard to on-duty internet use is fairly restrictive. According to the Department's Rules and Procedures, officers are only permitted to use the internet for official police business.

15. However, the policy as actually implemented is markedly different. The "forbidden unless authorized" rule contained in the Department's official Rules and Procedures was rarely, if ever, enforced. Officers and their supervisors throughout the Suffolk County Police Department openly used the internet for reasons outside their official capacity. In fact, the Inspector, Deputy Inspector, and Captain of the Sixth Precinct would, on a daily basis, observe the computer monitors on the precinct desk and see various internet activity that had nothing to do with police matters.

16. Additionally, the Department's Information Technologies Section and Internal Affairs Bureau always had the ability to oversee the websites visited by the precinct's computer stations. The Plaintiff is not aware of any instance of disciplinary action ever being taken for internet use, unless it involved profanity or pornography of some sort.

17. In or around the spring of 2006, Mr. Smith attempted to start a fantasy baseball league in the Police Department. Such leagues are played using computers over the internet. It was common for officers and detectives to participate in such leagues while on duty as they were good for morale and did not interfere with police duties. In order to recruit more players for this league, Mr. Smith posted notices, including one on a bulletin board in the Internal Affairs Bureau at Police Headquarters.

18. Shortly after the posting, the Department's Internal Affairs Bureau commenced an investigation of Mr. Smith's attempt to form a fantasy baseball league because of a mistaken impression that it constituted illegal gambling. Mr. Smith was ordered to appear at the Internal Affairs Bureau and answer questions.

19. After Mr. Smith explained to the investigators that fantasy baseball did not involve illegal gambling, the Department stopped its investigation and the matter was dropped. Mr. Smith was not disciplined in any way, nor was he told by any member of the Department to stop using precinct computers to play fantasy baseball. In fact, one of the Mr. Smith's supervisors, the precinct's Deputy Inspector, was invited to join the league. Although he declined, the Deputy Inspector never told Mr. Smith that the league was in any way improper or unauthorized.

20. In the aftermath of the fantasy baseball investigation, Mr. Smith told his Inspector, Deputy Inspector, and Captain about it, and they discussed the Department's rigid policy on internet use, and how it should be implemented. All of Mr. Smith's superiors instructed him that it would be in the best interest of the station to allow personal internet use, as long as it was limited to inoffensive material.

21. In 2004 or 2005, Mr. Smith became interested in the controversial Martin Tankleff case through accounts in the news media. The case was about an innocent man from Suffolk County who, in 1990, was wrongly convicted of murdering his parents. In 2003, Mr. Tankleff was attempting to have his conviction overturned. Those efforts continued until he succeeded and was released in December of 2007.

22. The case was a national media sensation because there was considerable evidence, in published accounts of the matter, of misconduct by the lead homicide detective. That same homicide detective had been named in several other scandals, one of which resulted in his being charged with robbery. His defense attorney in the matter later became the Suffolk County District Attorney and held that office during Tankleff's fight to obtain a new trial.

23. Mr. Smith, as a police officer, has never had any official role in the investigation or prosecution of Martin Tankleff. His entire knowledge of the Tankleff case was

derived from accounts in the news media and from a website maintained by Mr. Tankleff's supporters. He was not privy to any of the official documents or evidence in the case, other than that which was publicly available.

24. Mr. Smith found the Tankleff case very interesting for several reasons. If the accounts in the news media were true, then the real murderers were two known subjects who were still living in the Sixth Precinct where Lt. Smith worked. Also, the case involved a possible "false confession" which was a novel concept in the field of criminal justice. Finally, the case challenged the integrity of a broad cross-section of Suffolk County's legal community, from the Department's Homicide Squad, to a County Judge, to the District Attorney. Therefore, Mr. Smith took every opportunity to read more about the case and would frequently discuss it with his friends and co-workers. Some of these discussions took place by telephone and some by email. Some took place while Mr. Smith was on duty, using telephones and computers owned by the Police Department, and some did not.

25. Mr. Smith never divulged any confidential information about the Tankleff case. In fact, Mr. Smith has never had any such information. Rather, as he made clear in his emails, he was basing his opinions simply on what he had read on the internet.

26. Furthermore, at the time Mr. Smith was corresponding with others about the Tankleff case, the official position of the Suffolk County District Attorney's

Office and the Suffolk County Police Department was that it was a "closed case," that would not be re-opened. This position was publicly stated on many occasions.

27. In December 2007, when the department discovered that Mr. Smith was speculating that former department officials may have been corrupt, they retaliated against him by transferring him, suspending him, and eventually forcing him into retirement. This retaliatory action violated Mr. Smith's First Amendment right to free speech.

28. In or around late April, or early May of 2007, the Suffolk County Police Department began implementing a new plan to arrest unlicensed drivers, rather than merely issue them a traffic ticket. The stated reason for this initiative was to ensure that such motorists were actually giving their correct identity to the police officer. However, as contemporaneous news reports indicated, the Department was only enforcing this policy in areas with large populations of Hispanic day laborers. According to Newsday, the largest newspaper in Suffolk County, the vast majority of those arrested under this plan were illegal aliens of Hispanic origin.

29. This policy was criticized by many, including local and state legislators, as a hateful and intolerant plan to eradicate immigrants from Suffolk County. As such, this policy became a controversial, "hot button" issue for debate among concerned members of local communities. It was criticized by the District Attorney, and the

Police Commissioner denied that he had even been aware of it. Amid this controversy, the initiative was withdrawn.

30. In late May, *Newsday* published an article reporting that the Police Department intended to start arresting unlicensed drivers once again. This time, the stated rationale was safety. The article cited a study conducted by the American Automobile Association ("AAA") that, according to *Newsday*, found unlicensed drivers to be far more dangerous than licensed drivers. Accompanying the article was an editorial, which referred to the previous initiative and its perceived problems with ethnic discrimination.

31. While on duty and using the desktop computer provided to him, Mr. Smith read the article and editorial, and then downloaded a copy of the AAA study. After reading it, Mr. Smith believed that *Newsday* misrepresented its findings, and that there was no rational basis for the Police Department to resume arresting unlicensed drivers.

32. On May 29, 2007, Mr. Smith emailed Christine Armario of *Newsday* to voice his concerns that readers were being misinformed and that the Department was about to undertake a program that would likely result in further ethnic discrimination.

33. In early July 2007, Christine Armario wrote another story in *Newsday* that continued to inaccurately cite the AAA study. On July 8, 2007, Mr. Smith again

wrote Armario to discuss her story and specifically challenged the statistics she was using from the study.

34. At all relevant times in this matter, according to Chapter 26, Section 2 of the Department's Rules and Procedures, the Department's official policy was to "maintain an atmosphere of openness with the public and the news media."

35. However, the Department's actual "procedures" under its Rules and Procedures are so overly restrictive that they essentially prohibit all communications with the media, regardless of whether the officer is on or off duty. Thus, as written, the Department's Rules and Procedures constitute a violation of every Suffolk police officer's First Amendment right to free speech.

36. Upon information and belief, in December of 2007, the Department's Internal Affairs Bureau began investigating Mr. Smith.

37. On or about January 2, 2008, the Department transferred Mr. Smith to a lower-paying administrative position. He was given an office with no computer, no personnel to supervise, and no specific duties other than reviewing reports that other supervisors had already reviewed. This position excluded Mr. Smith from the opportunity to earn overtime pay, which is ordinarily available to lieutenants assigned to the patrol division, as well as the opportunity to earn "night differential" pay, because he was no longer able to work the midnight shifts.

38. Throughout the month of January, 2008, negotiations were held between Police Commissioner Dormer and Mr. Smith's union representatives about pending disciplinary charges. During these negotiations, the Police Commissioner repeatedly demanded that Mr. Smith retire and offered to drop any and all charges if he would do so. Mr. Smith was given a deadline of January 31st, 2008 to submit his retirement paperwork. He refused to do so.

39. On or about January 31, 2008, the Department served Mr. Smith with two disciplinary charges for "improperly communicating with the media." Both charges were connected to the e-mail he sent Christine Armario on May 27, 2009. Specifically, he was cited for misconduct for "expressing his personal opinion regarding [Departmental] policy" and for emailing a member of the media "in a manner tending to bring discredit to the Police Department." On or about February 1, 2008, Mr. Smith was suspended without pay for 30 days.

40. On or about February 7, 2008, the Department served Mr. Smith with 32 disciplinary charges. The charges included, but were not limited to: (1) improperly communicating with the media; (2) stating his personal opinion in a manner tending to bring discredit to the Department; (3) stating his personal opinion . . . in a manner tending to bring discredit to an elected law enforcement official, (4) accessing non-work related internet websites; and, (5) using profanity in his emails.

41. On or about March 1, 2008, Mr. Smith was again transferred to a different administrative assignment working a steady day shift, Monday through Friday, from 8:00 AM to 4:00 PM. He was assigned to an unused room in the Third Precinct that was filled with broken furniture and discarded office supplies. Once again, he was not allowed to supervise a squad of patrol officers, but was assigned the task of reviewing reports that had already been reviewed by others.

42. Mr. Smith was aware of the fact that had he submitted to a Departmental trial for the disciplinary charges, he likely would have been demoted two ranks to patrol officer, docked up to 60 days pay, and been restricted to a day job with no opportunity for night differential or overtime. This was at least a $100,000 penalty that he was facing had he agreed to a Departmental hearing.

43. Mr. Smith had also heard that the hearing officer assigned to his case would be a close associate of the Chief he had criticized by name in an email to the Newsday reporter and that he was going to be "made an example of" had he submitted to a hearing. It is likely that Mr. Smith would have been forced to accept an unwarranted demotion, and suffer serious monetary consequences as a result. He also knew that Department officials would make his life difficult in every way possible as retribution.

44. Threatened by these severe repercussions and the general animus he would be subjected to by Police Commissioner Richard Dormer, Deputy Police Commissioner Roger K. Shannon, and other Department officials, Mr. Smith had no choice but to retire. This forced retirement was the equivalent of a constructive discharge.

45. By launching a full-scale Internal Affairs investigation into his affairs, serving him with disciplinary charges, re-assigning him to a lower paying administrative position, suspending him without pay, and eventually forcing him into retirement, the Defendants retaliated against Mr. Smith for exercising his constitutional right to free speech.

46. As Police Commissioner, Richard Dormer was responsible for disciplining Department officers. He was aware of Mr. Smith's situation and signed the disciplinary charges, and the orders of re-assignment, suspension and retirement. Therefore, Commissioner Dormer directly engaged in the retaliatory acts against Mr. Smith.

47. After 20 years of service with the Department, each officer is entitled to a 50% pension. The pension salary figure is based upon the average annual wages earned during the last three years of an officer's career. Additionally, each year an officer continues to work entitles him to an additional 1.67%. For example, an officer

who worked 21 years would be entitled to an annual pension of 51.67% of the average salary he received over his last three years of service.

48. It is common practice for police officers contemplating retirement to work midnight and overtime shifts in order to increase their base salary and, as a result, their pension.

49. At the time of his re-assignment, suspension, and forced retirement, Mr. Smith planned on working for at least another five years, perhaps longer. Therefore, Mr. Smith has suffered monetary damages equal to the amount his annual pension has been reduced. This amount equals the increased pension percentage he would have received for longer service multiplied by the increased "final average salary" amount he would have earned through raises, increased overtime, etc.

50. Mr. Smith suffered monetary damages equal to the difference between any salary he would have received had he remained with the Suffolk County Police Department and any pension he has collected and will collect in the future. Any calculation of his lost wages must include raises that would have been received due to renegotiation of the collective bargaining agreement between Suffolk County and the Superior Officers Association or due to an award in arbitration.

51. Mr. Smith suffered monetary damages equal to the amount of night differential pay he would have earned had he remained on steady midnight tours of duty until his retirement.

52. Mr. Smith has suffered monetary damages equal to the amount of overtime pay he would have earned had he remained on steady midnight tours of duty until his retirement.

53. Mr. Smith suffered monetary damages equal to the amount of all wages lost as a result of being suspended without pay for thirty days.

54. Mr. Smith suffered monetary damages equal to the reduction in his pension caused by any and all diminished wages resulting from his administrative reassignment.

55. Mr. Smith suffered monetary damages consisting of loss of accruals which would have been paid as cash upon his retirement.

56. As a result of Defendants' actions, Mr. Smith experienced stress, anxiety, marital discord, and loss of sleep. He also suffered humiliation, embarrassment, and damage to his reputation which may have an adverse impact upon his future employment prospects and wages.

## **CLAIMS FOR RELIEF**

57. Based on the foregoing, Defendants retaliated against Mr. Smith for exercising his constitutional right to freedom of speech by speaking about matters of public concern by launching an investigation into his personal affairs, serving disciplinary charges, reassigning him to a lower-paying administrative position, suspending him without pay, and eventually forcing him into retirement. Mr. Smith brings this suit pursuant to 42 U.S.C. § 1983 for violations of the rights secured to him by the First Amendment of the U.S. Constitution and Article I, § 8 of the New York State Constitution.

**WHEREFORE,** the Plaintiff demands judgment against the Defendants for all compensatory, emotional, psychological and punitive damages, lost compensation, front pay, back pay, injunctive relief, and any other damages permitted by law pursuant to the above referenced causes of action. It is respectfully requested that the Court grant the Plaintiff any other relief to which he is entitled, including but not limited to:

1. Reinstating Mr. Smith as Lieutenant of the Patrol Division in the Sixth Precinct, and in doing so, the County must bear any and all expenses associated with the reinstatement, including the legal and/or accounting fees associated with returning money to the New York State Police Pension system;

2. Awarding reasonable attorneys fees and costs and disbursements of this action;

3. Issuing a permanent injunction enjoining Defendants from any further actions abridging the Plaintiff's rights, including but not limited to, an injunction preventing the Defendants or any of its agents or employees from providing negative, misleading, or disparaging references pertaining to the Plaintiff's employment; and,

4. Granting such other and further relief that to the Court seems just and proper.

**Further,** Plaintiff demands a trial by jury.

Dated: Carle Place, New York
February 24, 2010

THE LAW OFFICE OF
STEVEN A. MORELLI, P.C.
*Attorneys for Plaintiff*
One Old Country Road, Suite 347
Carle Place, New York 11514
(516) 393-9151

_____
Steven A. Morelli (SM 4721)
Eric S. Tilton (ET 9547)