UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
RAYMOND SMITH,

                         Plaintiff,                              **MEMORANDUM AND ORDER**
                                                          CV 10-1397 (ARL)

           -against-

COUNTY OF SUFFOLK and RICHARD DORMER,
individually and in his official capacity, as Suffolk
County Police Commissioner,

                         Defendants.
-------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

        Plaintiff Raymond Smith ("plaintiff" or "Smith") commenced this action against

defendants, the County of Suffolk and Commissioner Richard Dormer ("Dormer"), in his official

capacity as Suffolk County Police Commissioner and in his personal capacity (collectively

"defendants"), alleging that defendants retaliated against him for the assertion of his First

Amendment right to freedom of speech in violation of 42 U.S.C. § 1983, the First Amendment of

the United States Constitution and Article I, § 8 of the New York State Constitution.  The parties

have consented to the undersigned's jurisdiction pursuant to 28 U.S.C. § 636.  Before the court

are defendants' motion for summary judgment on each of plaintiff's claims and plaintiff's cross-

motion for partial summary judgment on the issue of liability pursuant to Federal Rule of Civil

Procedure 56.  For the reasons set forth herein, defendants' motion is granted, and plaintiff's

cross-motion is denied.

## BACKGROUND

        The following facts, drawn from the Complaint and the parties' Local Civil Rule 56.1

Statements, are construed in the light most favorable to the non-moving party, except as

otherwise noted.[1]  *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

On January 2, 1981, the defendant Suffolk County Police Department hired plaintiff and upon graduation from the Police Academy, assigned Smith to the Fourth Precinct as a patrol officer.  (Defs. 56.1 Statement at ¶ 1.)  In 1986, plaintiff was promoted to the rank of Sergeant and assigned to the Sixth Precinct, and in 1992, he was promoted to the rank of Lieutenant, a position he held until 2008.  (*Id.* at ¶ 2.)

## A.    Factual Background of Employment Conduct

In December 1997, Smith obtained and installed a modem on a police computer in the Lieutenants' office.  (*Termini Decl.*, dated June 28, 2012, Ex. G, Attachment 17.)   Upon its discovery, the Deputy Inspector, Executive Officer of the Sixth Precinct issued a written directive stating that Smith was not to install, reconfigure or otherwise change any programs on the computers in the Lieutenant's Office.  (*Id.*)

On June 20, 2000, the Executive Officer of the Data Services Section requested that the Internal Affairs Bureau investigate a possible incident of computer tampering occurring on the Sixth Precinct's Mobile Data Computer ("MDC") by Smith on May 17, 2000, which had prevented other users from accessing the computer.  (Defs. 56.1 Statement at ¶ 3; *Termini Decl.*, dated June 28, 2012, Ex. G.)  The investigative report dated April 17, 2001, found that Smith had attempted to create a user profile in the MDC and concluded:

> [t]he MDC that is provided in the patrol district's sector cars is a tool exclusively used to communicate via a police network for business purposes only.  It is not a desktop personal computer to be configured for your personal preferences. Although the incident precipitated by Lieutenant Smith was not caused

---

[1]Where only one party's 56.1 statement is cited, the fact is undisputed or the opposing party has offered no evidence to controvert that fact.

maliciously, it showed a clear disregard by a seasoned superior officer for training received and guidelines given. . . .  After careful review of the facts investigated above, I have determined that Lieutenant Smith did, in fact, misuse department equipment, thus causing inconvenience to others in violation of Chapter 5, Section 3VI.A.1.bb of the Rules and Procedures.  This investigation should be classified as Substantiated.

(*Termini Decl.*, dated June 28, 2012, Ex. G.)  On April 24, 2001, the Internal Affairs/Inspectional Services Bureau reviewed the investigative report and noted that the MDC training did not address user profiles.  (*Id.*)  As a result of the investigation, Smith was issued a written directive on August 21, 2000, stating in part that plaintiff was to read and familiarize himself with Department General Order 00-17, regarding "Computer Procedures."  (*Id.*, Ex. B, Attachments 17-18.)  Smith was given a copy of this Order and signed an acknowledgment of receipt.  (*Id.*)  General Order 00-17 stated in pertinent part:

| | |
|---|---|
| Section 8/V/1: | Department computers are for official use only.  All transmission through Department computers are considered official communications. . . .  There is no individual right to privacy with regard to this material. |
| Section 8/V/2: | The use of any Department information or equipment for personal use or gain is strictly prohibited. |
| Section 8/V/7: | Internet access that is made available is for Department use only.  Any employee who abuses internet access privileges by accessing inappropriate sites, for other than official Department business, or using the internet for other than business-related activities is subject to disciplinary action. |

(*Id.*)

Smith was investigated by the Internal Affairs Bureau in May 2006 regarding his activities on March 16, 2006 when he used a Department computer and supplies to make "Fantasy Baseball" flyers to advertise an upcoming "Fantasy Baseball League" throughout the Department.  (*Termini Decl.*, dated June 28, 2012, Ex. H.)  On May 3, 2006, the Internal Affairs

3

Bureau concluded:

> [d]ue to the minor nature of Lt. Smith's transgression, and his appreciation and acknowledgment during his interview that his conduct was improper, it is recommended that he receive documented counseling regarding the misuse of departmental equipment and materials. It is further recommended that this matter be classified as closed."

(*Id*.)

On July 15, 2007, Smith arrested an individual for driving while intoxicated ("DWI").

(Defs. 56.1 Statement at ¶ 9.) In connection with the arrest, plaintiff was notified to appear at a New York State Department of Motor Vehicle Hearing ("NYS DMV") on July 27, 2007 at 9:00 a.m. for a DWI refusal to submit to a chemical test hearing. (*Id*.) Smith arrived late to the hearing, forcing the Administrative Law Judge to adjourn the case because he was not present.

(*Id*.) The Suffolk County Police Department filed a Supervisor's Complaint Report on July 27, 2007 detailing Smith's violations as follows:

> On [July 27, 2007 at 9:00 a.m.] Lt. Smith failed to appear as required at a DWI refusal hearing. The lieutenant, whose tour of duty was changed to 0700-1500 from a 2100-0700 solely for the purpose of allowing this appearance, as requested by NYS DMV, had failed to prepare and acquire the paperwork necessary on a timely basis. Lt. Smith, as per his own testimony, advised that the requisite paperwork was not in the appropriate file cabinet as is the norm, but rather was 'buried' on the desk of the Head Clerk. Lt. Smith advised that it took him 'almost an hour' to find the paperwork. Despite this, Lt. Smith still should have had sufficient time to locate the materials, having reported for duty at 0700 hours with a 0900 scheduled hearing. Lt. Smith, however, advised that [he] did not begin to look for the materials until after 0800 hours. When asked what he had done from 7 to 9 (am), the Lt. replied that he first had 'breakfast, coffee, whatever.' After locating the materials, Lt. Smith advises that he reported to the hearing at 0936 hours, at which time he was notified that the hearing had been adjourned due to his non-appearance.

> It should be noted that the cost of his failure to prepare, on timely basis, for this hearing includes the overtime needed to replace Lt. Smith on his regularly scheduled tour of duty, in addition to the change of tour fees paid to Lt. Smith.

> The Lieutenant's contention that responsibility rests with the administrative staff is only marginally supported. While the shortage of staff has resulted in a severe backlog in the filing of paperwork, this shortage is known to him. In addition, Lt. Smith was notified of the need for his appearance at the hearing 9 days prior to the hearing, allowing ample time to prepare. Primary responsibility for his failure to adequately perform his duties in the matter at hand lies with his decision to wait until 1 hour prior to his scheduled hearing appearance to begin his preparation.

(*Termini Decl.*, dated June 28, 2012, Ex. I.) Because the plaintiff declined to accept disciplinary action without a statutory hearing, on November 7, 2007 the Commanding Officer of the Sixth Precinct referred this matter to the Internal Affairs Bureau to prepare Department charges and specifications in reference to the charge of his failure to perform duties in connection with a court appearance. (*Id.*) In addition, as a result of the plaintiff's explanation as to why he was late to the DMV hearing, *viz.* he arrived late *inter alia* because he was reviewing his case notes on his computer, the Commanding Officer of the Sixth Precinct requested a forensic examination of the Department computer. (*Termini Decl.*, dated June 28, 2012, Exs. B, I.) The Sixth Precinct computer used by Smith on a daily basis was accessed and examined for investigative purposes by Sergeant Frank Luciano of the Internal Affairs Bureau. (Defs. 56.1 Statement at ¶ 10; *Termini Decl.*, dated June 28, 2012, Ex. I.)

The administrative investigation conducted by the Internal Affairs Bureau concurred with the findings of the Sixth Precinct's Commanding Officer, and in an internal correspondence dated January 17, 2008 reported as follows:

> Lt. Smith was responsible to be at the hearing on 7/27/07 at 0900, prepared for the hearing with the required paperwork, but was not. As a result, the hearing was adjourned when he had not arrived by 0930 hours. By his actions, Lt. Smith has violated Chapter 16, Section 2, VI. G. 3 of the Rules and Procedures, "Arresting Officer's Responsibility." It is recommended that the allegation be classified as Substantiated.

(*Termini Decl.*, dated June 28, 2012, Ex. I.)  Plaintiff was formally served with a Disciplinary Charge on February 7, 2008 for misconduct based on an alleged failure to perform his duties in connection with his failure to respond to a Refusal Hearing at the Department of Motor Vehicles.  (*Id.*)  A Departmental Hearing was scheduled for March 18, 2008, which was later postponed to April 24, 2008.  (*Id.*)

An examination of the Sixth Precinct computer used by Smith indicated that the DWI case notes were last modified on July 15, 2007, but because the computer does not record and store each time and date the file is accessed, it could only be concluded that the notes were not modified on July 27, 2007.  (*Termini Decl.*, dated June 28, 2012, Ex. I.)  Further information revealed that other internet websites were accessed on July 27, 2007 "between the hours of 0813 and 0815."  (*Id.*)

## B.  Factual Background Underlying the First Amendment Retaliation Claim

In the course of the forensic investigation, Sergeant Luciano discovered that a large number of e-mails from plaintiff's Departmental e-mail account were sent to various outside sources, including the news media, for non-business and/or personal reasons.  (*Termini Decl.*, dated June 28, 2012, Ex. B.)  One such e-mail was to Christine Armario of *Newsday* on May 29, 2007, wherein plaintiff stated that with respect to the Suffolk County Police Department's policy concerning the arrests of unlicensed drivers, the Police Department was about to undertake a program that would lead to ethnic discrimination.  (Compl., ¶ 32; Pls. 56.1 Counterstatement ¶¶ 38, 42, 44-46.)  In a further e-mail to Christine Armario on July 8, 2007, plaintiff criticized the Police Department and Chief Ponzo, stating "[y]ou let Chief Ponzo get away with that one in six comment and you've now given him a platform to perpetuate this myth.  This has always been

about racial profiling and you've been bamboozled into believing it's a safety issue.  That is an obvious lie."  (Pls. 56.1 Counterstatement ¶ 48*; Termini Decl.*, dated June 28, 2012, Ex. B, Attachment 6-5.)  The investigation also uncovered an e-mail sent by plaintiff on January 16, 2007 to Jeffrey Toobin, a *CNN* commentator, giving him a "tip" about the Martin Tankleff case wherein he stated that the homicide detective may have helped planned the murder, orchestrated the cover up and had committed perjury; that the district attorney was up to his ears in ethical conflicts and appeared to be protecting the actual murderers; and that there was a long history of abuses by the Suffolk County Police Homicide Squad.  (*Termini Decl.*, dated June 28, 2012, Ex. B, Attachment 6-9; Pls. 56.1 Counterstatement ¶¶ 31-32.)   Plaintiff signed each of these e-mails as "Lieutenant Raymond F. Smith, Sixth Precinct."  (*Id.*)  In addition, Sergeant Luciano reported that an examination of the internet records indicated an "abuse of the Department's internet, in that, Lt. Smith expended an excessive amount of time on the internet, for non-business reasons and/or personal entertainment, during his normally assigned work schedule."  (*Termini Decl.*, dated June 28, 2012, Ex. B.)

As a result, the Internal Affairs Bureau initiated a separate administrative investigation into the potential misuse of a police computer pursuant to an Internal Affairs Bureau Alert Report.  (*Id.*)  The investigation revealed that several of these e-mails concerned communications about Department policy and/or prior police investigations where Smith represented himself as a high-ranking member of the Department, and where he expressed his own personal opinions of such policy, including high profile criminal investigations, in a negative manner.  (*Id.*; Defs. 56.1 Statement at ¶ 13.)   On December 12, 2007, Sergeant Luciano interviewed Smith and presented plaintiff with various e-mail records forensically taken from his computer and various internet

logs obtained from the Information Technology Section.  (*Id.*)  During his interview, Smith

acknowledged that without proper consent or official required permission, he utilized the internet

from a Department computer for non-business related and personal reasons and corresponded

with news media and other sources from his Department computer.  (*Id.*; Compl. ¶¶ 1, 24-26, 32-

33.)  Smith also acknowledged that he was aware of the following warning screen which was

generated every time an employee logs onto a Department computer:

> This is a Suffolk County Police (SCPD) Department computer system.  This
> system, including Internet access, is provided only for authorized SCPD use.
> SCPD computer systems may be monitored for all lawful purposes.  All
> information, including personal information, placed on or sent over this system
> may be monitored.  Evidence of unauthorized use collected during monitoring
> may be used for administrative or criminal action.  Use of this system constitutes
> consent to monitoring for these purposes.

(*Termini Decl.*, dated June 28, 2012, Ex. B, Attachment 11.)  Sergeant Luciano's investigation

revealed multiple counts of violations of the Department's Rules and Procedures, including the

improper use of a police computer, the improper release of Department information and

confidential business, and conduct unbecoming of an officer.  (*Termini Decl.*, dated June 28,

2012, Ex. B.)  The Captain of the Internal Affairs Bureau concurred with Sergeant Luciano's

findings and the investigation was found to be substantiated.  (*Id.*)

On January 2, 2008, Smith was transferred to an administrative position and was given an

office with no computer, no personnel to supervise, and with no opportunity to earn overtime pay

or night differential pay because he was no longer working the midnight shift.  (Compl. ¶ 37.)

On January 31, 2008, Smith was served with two disciplinary charges pursuant to Section

75 of the Civil Service Law of the State of New York for the improper use of a police computer

while on duty and the improper release of police information and Department information to the

media in connection with the e-mails plaintiff sent to Christine Armario at *Newsday* on May 29, 2007.  (Compl., ¶ 39; *Termini Decl.*, dated June 28, 2012, Ex. K; Defs. 56.1 Statement at ¶ 17.)  Smith was cited for (i) utilizing Department e-mail without prior authorization to improperly release information regarding Department policy, police information and confidential Department Business; (ii) expressing his personal opinion of such policy as a representative of the Department and in a manner tending to bring discredit to the Police Department; and (iii) for conduct unbecoming an officer in violation of the Rules and Procedures of the Suffolk County Police Department.  (*Id.*)  On February 1, 2008, plaintiff was suspended without pay for thirty (30) days.  (Compl., ¶ 39; Pls. 56.1 Counterstatement ¶ 57.)

On February 7, 2008, plaintiff was served with thirty-two (32) additional disciplinary charges pursuant to Section 75 of the Civil Service Law of the State of New York for the improper use of a police computer while on duty as well as for violations of the improper release of police information and Department Business.  (Compl., ¶ 40; *Termini Decl.*, dated June 28, 2012, Ex. M; Defs. 56.1 Statement at ¶ 17.)  The charges against Smith included, *inter alia*, improperly communicating with the media; stating his personal opinion in a manner tending to bring discredit to the Department; stating his personal opinion . . . in a manner tending to bring discredit to an elected law enforcement official; using e-mails to conduct non-Department business; the improper usage of media communications; accessing non-work related internet websites; using profanity in his e-mails; and the failure to refer a response of a media inquiry to the Public Information Section.  (*Id.*)  On March 1, 2008, plaintiff was transferred to an administrative assignment, and working a steady day shift in the Third Precinct with no supervisory duties.  (Compl., ¶ 41; Pls. 56.1 Counterstatement ¶¶ 60-61.)  Rather than submit to a

Departmental trial and face disciplinary charges, plaintiff retired on April 30, 2008. (*Tilton Decl.*, dated June 29, 2012, Ex. 1 at 55; *Termini Decl.*, dated June 28, 2012, Ex. J.)

## C.    Procedural Background

Smith filed the instant complaint on March 29, 2010 pursuant to 42 U.S.C, § 1983, alleging violations of the First Amendment and Article I, § 8 of the New York State Constitution. Specifically, plaintiff alleges that defendants retaliated against him for exercising his constitutional right to freedom of speech by launching an investigation into his personal affairs, serving disciplinary charges, reassigning him to a lower-paying administrative position, suspending him without pay, and eventually forcing him into retirement. The defendants move for summary judgment to dismiss all of the claims pursuant to Fed. R. Civ. P. 56. Plaintiff cross-moves for partial summary judgment on this issue of liability pursuant to Fed. R. Civ. P. 56.

## DISCUSSION

## A.    Summary Judgment Standards

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Puglisi v. Town of Hempstead,* No. 10-CV-1928 (JS)(GRB), 2012 WL 4172010, at *6 (E.D.N.Y. Sept. 17, 2012) (quoting *In re Blackwood Assocs., L.L.P.*, 153 F.3d 61, 67 (2d Cir. 1998) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); Fed. R. Civ. P. 56(c). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-

movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996).

The trial court's responsibility is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To defeat summary judgment, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Id.*; *see Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000). "Mere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment. *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (1986). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

"The same standard applies, where, as here, the parties filed cross-motions for summary judgment." *Morales v. Quintel Enter., Inc.,* 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted). Thus, even where both sides have moved for summary judgment and assert the absence of any genuine issues of material fact, "a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."

*Morales,* 249 F.3d at 121 (citation omitted). With these standards in mind, the court addresses

the pending motions. The parties' arguments for and against summary judgment are principally

the same. Thus, rather than consider each motion separately, the court will instead address the

merits of the parties' arguments in their moving and opposition papers in the relevant discussion

section below.

**B.      First Amendment Retaliation Under Section 1983**

Section 1983 provides in pertinent part:

[e]very person who, under color of any statute, ordinance, regulation, custom, or
usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen
of the United States or other person within the jurisdiction thereof to the
deprivation of any rights, privileges, or immunities secured by the Constitution
and laws, shall be liable to the party injured.

42 U.S.C. § 1983. To state a claim for relief in an action pursuant to Section 1983, a plaintiff

must establish (1) the deprivation of a right secured by the Constitution or laws of the United

States, and (2) that the alleged deprivation was committed under color of state law. *American*

*Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). Here, for purposes of the motion, the

parties do not dispute that defendants were acting under color of state law. The question

presented, therefore, is whether defendants' conduct deprived Smith of the rights he asserts under

the First Amendment. Specifically, plaintiff claims he was retaliated against for his use of a

police computer "to speak his mind and express his opinion to members of the news media"

about (1) the Department's policy of arresting unlicensed drivers and whether that policy

contributed to racial profiling, and (2) the Martin Tankleff case.

The Second Circuit has "described the elements of a First Amendment retaliation claim in

several ways, depending on the factual context." *Williams v. Town of Greenburgh*, 535 F.3d 71,

76 (2d Cir. 2008). Where, as here, a public employee brings a First Amendment retaliation claim, he must "bring forth evidence showing that he has engaged in protected First Amendment activity, he suffered an adverse employment action, and there was a causal connection between the protected activity and the adverse employment action." *Anemone v. Metropolitan Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011); *see Garcia v. Hartford Police Dep't*, 2013 WL 309981, at *8 (2d Cir. Jan. 28, 2013). If plaintiff can produce evidence supporting these three elements, the defendants can, nonetheless, prevail on their motion for summary judgment if the defendants are able to establish (1) that the same adverse employment action would have occurred "even in the absence of the protected speech," *Mount Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 278 (1977); *see Cotarelo v. Village of Sleepy Hollow Police Dep't.,* 460 F.3d 247, 252 (2d Cir. 2006), or alternatively, (2) that the employee's speech was likely to disrupt the government's activities and the harm caused by the disruption outweighs the First Amendment value of the plaintiff's speech, *see Locurto v. Guiliani,* 447 F.3d 159, 172 (2d Cir. 2006) (referring to the balancing inquiry under *Pickering v Board of Educ.*, 391 U.S. 563, 568 (1968)). The latter defense is known as the *Pickering* balancing test and is a question of law for the court. *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004). Finally, even if the defendants prevail in the *Pickering* balance, plaintiff may still "carry the day" if he can show that the motivation for the adverse action was "retaliation for the speech itself, rather than for any resulting disruption." *Reuland v. Hynes*, 460 F.3d 409, 415 (2d Cir. 2006).

**(1)    Constitutionally Protected Speech**

When a citizen enters government service, he or she "by necessity must accept certain limitations on his or her freedom," including a limitation on the protections afforded a

government employee's speech. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). "Speech by a public employee is protected by the First Amendment only when the employee is speaking as a citizen . . . on a matter of public concern." *Ross v. Breslin*, 693 F.3d 300, 305 (2d Cir. 2012) (internal quotation marks and citation omitted). Hence, a government official, such as a police officer, seeking to invoke the protections of the First Amendment, must establish not only that the subject of his speech was a matter of public concern, but in addition that when he spoke on the subject, he spoke "as a citizen" rather than "as a government employee." *Garcetti*, 547 U.S. at 420-21. "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id*. at 419.

### (a)    Speech on a Matter of Public Concern

The question of "[w]hether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." *Lewis v. Cowen,* 165 F.3d 154, 163 (2d Cir. 1999); *see Garcia*, 2013 WL 309981, at *8 (same). "To constitute speech on a matter of public concern, an employee's expression must be fairly considered as relating to any matter of political, social or other concern to the community." *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (internal quotation marks and citation omitted); *see Hodge v. City of Long Beach,* No. 07 CV 4084, 2010 U.S. Dist. LEXIS 138344, at *48 (E.D.N.Y. Dec. 28, 2010) ("[a] matter of public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication") (internal quotation marks and citation omitted). In *Garcetti*, the Supreme Court reinforced "the premise that while

the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance." 547 U.S. at 420 (internal quotation marks and citation omitted). That being said, "[s]peech relating to the functioning of government is of particularly great import to the public." *Griffin v. City of New York*, No. 10 CV 2592 (RJD) (MDG), 2012 WL 3090295, at *14 (E.D.N.Y. July 31, 2012). Indeed, "[e]xposure of official misconduct, especially within the police department, is generally of great consequence to the public." *Jackler*, 658 F.3d at 236 (citation omitted); *see Hoyt v. Andreucci,* 433 F.3d 320, 330 (2d Cir. 2006) ("We view concerns raised in the government about the lawfulness of public officials' actions as implicating a matter of public interest"); *see Mandell v. County of Suffolk,* 316 F.3d 368, 383 (2d Cir. 2003) (holding plaintiff's speech which criticized the police department's approach "to fighting organized crime, its resistance to change, and its systemic racism and anti-Semitism" was a matter of public interest); *see also Anemone v. Metro. Transp. Auth.,* 410 F. Supp. 2d 255, 265 (S.D.N.Y. 2006) ("Speech relating to public corruption and/or a public entity's failure to adequately or properly investigate such corruption lies comfortably within the [] categories of protected expression"). Moreover, a plaintiff's comments on the police department's use of public funds and/or inefficiency in managing and operating the department is a matter of public concern. *See Lewis,* 165 F.3d at 164. Notably, the speech need not be expressed publicly to address a matter of public concern. *See Anemone.,* 410 F. Supp. 2d at 235 ("The fact that a statement was made to the employer in private is not determinative of whether its subject was a matter of public concern").

The media e-mails which are the subject of plaintiff's speech to *Newsday* concerned (i) a Suffolk County Police Department policy that the department was about to undertake concerning

15

the arrests of unlicensed drivers that would lead to ethnic discrimination, (ii) a report on fatality statistics and a statement that the department Chief was perpetuating a myth because the Department policy was about racial profiling and not safety, (iii) a criticism of police department chiefs who initiated the unlicensed driver initiative because the officers were not clear what to do, and (iv) information about the Department saving money on civilianization. Plaintiff's e-mail to *CNN* gave a "tip" that (i) the Tankleff case was more than a false confession case and was worth a closer look, (ii) the case concerned corruption within the Suffolk County Police Homicide Squad, including that the homicide detective may have planned the murder and orchestrated the cover-up, (iii) the District Attorney has ethical problems and appears to be protecting the actual murderers, and (iv) there were abuses in the confessions taken by the homicide squad. "Where a public employee's speech concerns a government agency's breach of the public trust, as it does here, the speech relates to more than a mere personal grievance and therefore falls outside *Garcetti*'s restrictions." *Anderson v. State of New York Office of Court Admin.*, 614 F. Supp. 2d 404, 428 (S.D.N.Y. 2009); *see Skehan v. Village of Mamaroneck,* 465 F.3d 96, 106 (2d Cir. 2006) ("Plaintiffs' speech plainly concerned issues of public concern: misfeasance within the police department and allegations of an ongoing cover-up"), *overruled on other grounds by Appel v. Spiridon,* 531 F.3d 138 (2d Cir. 2008). As *Garcetti* observed, "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance." 547 U.S. at 425. As such, plaintiff's speech concerned a matter of public concern. The court next turns to the more difficult question of whether the form and context of Smith's speech suggests that he spoke as a police officer or as a citizen.

      **(b)**       **Speech as a Citizen**

The inquiry into whether a public employee has spoken as an employee or as a citizen is "largely a question of law for the court." *Jackler,* 658 F.3d at 237. "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. The "pursuant to" inquiry turns on whether the speech "owes its existence to a public employee's professional responsibilities." *Garcetti*, 547 U.S. at 421. In construing a government employee's job duties, the Supreme Court cautioned that:

> [f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id.* at 424-35. While the Supreme court decision in *Garcetti* narrowed the scope of protected speech by public employees, it did not "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there [was] room for serious debate" as to whether the employee spoke in the context of those duties. 547 U.S. at 424; *see Kelly v. Huntington Union Free Sch. Dist.*, No. 09-CV-2101 (JFB)(ETB), 2012 WL 1077677, at *11 (E.D.N.Y. Mar. 30, 2012).

In *Weintraub v. Board of Educ.*, 593 F.3d 196, 202 (2d Cir. 2010), the Second Circuit "expanded on the characteristics of employee speech noted in Garcetti" to provide guidance. *Ricciuti v. Gyzenis,* 2011 WL 6816542, at *7 (D. Conn. Dec. 28, 2011). The *Weintraub* Court first observed that when speech is made in furtherance of one of the employee's core duties, encompassing speech that is "part and parcel" of an employee's ability to execute his duties, it is

17

not citizen speech but employee speech.  *Id.*  Second, the speech must have no relevant analogue to citizen speech.  *Id.*  Third, speech that is publicly disclosed and goes outside the workplace, such as letters to newspapers or complaints to elective officials or independent state agencies, as compared to union grievances, may well be citizen speech.  *Id.*  "Since *Garcetti*, some lower courts have developed more guidelines for determining whether speech is made pursuant to a public employee's official duties.  Although none of the following factors are dispositive, they may be considered by the Court:  the plaintiff's job description; the persons to whom the speech was directed; and whether the speech resulted from special knowledge gained through the plaintiff's employment."  *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 506 (E.D.N.Y. 2011) (internal quotation marks and citation omitted).  "[T]wo relevant factors that, considered in isolation, are not dispositive are whether the speech occurs in the workplace and whether the speech concerns the subject matter of the employee's job."  *Kelly*, 2012 WL 1077677, at *12 (citing *Garcetti*, 547 U.S. at 420-21)).   Further, "reported cases are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job."  *Caraccilo v. Vill. of Senaca Falls*, 582 F. Supp. 2d 390, 411 (W.D.N.Y. 2008); *see Carter v. Incorporated Village of Ocean Beach,* 693 F. Supp. 2d 203, 211 (E.D.N.Y. 2010) (same).

"As a rule of thumb, activities required of the employee as part of his employment duties are not performed 'as a citizen' if they are not 'the kind of activity engaged in by citizens who do not work for the government.'"  *Jackler,* 658 F.3d at 237 (quoting *Garcetti*, 547 U.S. at 423); *see Schoolcraft v. City of New York,* No. 10 Civ. 6005 (RWS), 2012 WL 2161596, at *5 (S.D.N.Y. June 14, 2012) ("[a]lthough there is no simple checklist or formula by which to determine whether the employee was speaking as a private citizen or as a public employee . . . the cases distinguish between speech that is the kind of activity engaged in by citizens who do not work for

the government and activities undertaken in the course of performing one's job') (internal

quotation marks and citation omitted). "The fact that a plaintiff's speech is related to his or her

job does not automatically result in a loss of First Amendment protection." *Schoolcraft*, 2012

WL 2161596, at \*5. Thus, in evaluating whether a government employee was speaking as a

citizen rather than as a public employee, "the issue is whether the alleged speech is required by

[p]laintiff's job duties, and the fact that speech is related to the employee's occupation does not

necessarily preclude First Amendment protection." *Id.* In short, "[t]he inquiry into whether a

public employee is speaking pursuant to [his] official duties is not susceptible to a bright line

rule." *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012). "Courts must examine the nature of the

plaintiff's job responsibilities, the nature of the speech, and the relationship between the two."

*Id.*

Evaluating whether the speech at issue in this action was made "pursuant to" plaintiff's

official duties as a police officer or as a citizen presents a difficult problem. On the one hand,

Smith's speech occurred in the workplace, utilizing a police computer during work hours, bore

an official signature reflecting plaintiff's position as Lieutenant Raymond F. Smith in the Sixth

Precinct, and related to information concerning the plaintiff's employment as a police officer.

On the other hand, Smith engaged in speech for which there is a "relevant citizen analogue"

when he sent external e-mails outside the chain of command to the press and media. *Weintraub*,

593 F.3d at 203. In addition, the content of the speech was not directed toward the proper

performance of plaintiff's own ability to execute his specific job duties as a police officer, but

rather can be characterized as a broader policy-related commentary on the Department's policies

and operations. *See, e.g., Pickering*, 391 U.S. at (holding that plaintiff engaged in protected

speech when he submitted a letter to a newspaper criticizing the school board's handling of a

bond issue proposal, its allocation of financial resources, and efforts to prevent teachers from

criticizing the bond issue). While it is undisputed that as a Lieutenant in the Sixth Department's Patrol Division, Smith's responsibilities included day-to-day supervision of a "squad" consisting of sergeants and police officers, and his specific duties included notifying officers of special problems to be given attention during a particular shift, planning for upcoming events in the community, responding to citizen complaints, coordinating activities with other squads and precincts, and preparing computerized reports, (Pl.'s 56.1Counterstatement, ¶ 18), the court finds that plaintiff's speech was not "in furtherance of one of" these "core duties" nor was it "part-and-parcel" of Smith's ability to properly execute his duties. *Garcetti*, 547 U.S. at 198, 203.

Further, plaintiff's e-mails referred to alleged misconduct, inefficiencies and corruption extending outside his own personal duties, and in the case of the e-mail regarding Martin Tankleff, affected a closed case in another department with which he had no personal interaction or job connection. *See Dillon v. Suffolk County Dep't of Health Servs.,* No. 07-cv-4722 (ADS)(WDW), 2013 WL 168972, at *11 (E.D.N.Y. Jan. 16, 2013) (finding plaintiff's complaints about systematic mistreatment and corruption extending outside her own personal duties constituted civilian speech); *McLaughlin v. Pezzolla*, No. 06 Civ. 0376, 2010 WL 826952, at *3 (N.D.N.Y. Mar. 4, 2010) (finding speech addressing systemic corruption extending outside personal duties constituted protected speech). To the extent an argument can be made that as a police officer, Smith had a professional duty to report any misconduct or corruption, the recent decision in *Dillon* observed that

> [t]he Supreme Court's narrow hold[ing] that when public employees make
> statements pursuant to their official duties, the employees are not speaking as
> citizens for First Amendment purposes, should not be read to overrule all First
> Amendment whistleblower protection cases by generally categorizing
> whistleblowing as part of employees' employment obligations.

2013 WL 168972, at *11 (internal quotation marks and citations omitted); *cf. Griffin*, 2012 WL 3090295, at *10 ("Thus the fact that plaintiff's reporting may have been required by some

broader written policy applicable to all police officers has no bearing on whether such reporting was actually expected or permitted, much less tolerated, in practice").

Finally, with respect to defendants' argument that Smith's speech cannot be protected by the First Amendment because he used information acquired from his employment, to wit: (i) that he had not seen an arrest for "unlicensed operation" and he had not seen too many other cops going to go out of their way to find one, (*Termini Decl.*, dated June 28, 2012, Ex. B, Attachment 6-4.); (ii) identifying Chief Ponzo as in charge, (*id*. at Attachment 6-5); (iii) stating that the officers did not understand what the chiefs decide and that there were no extra cops on overtime, (*id*. at Attachment 6-7); (iv) implying inside information by stating there was a lot more to the case than meets the eye and then discussing the lead homicide detective and District attorney and the abuse of confessions in the Department, (*id*. at Attachment 6-9); and (v) stating that civilianization has saved money and giving specific details on the operations at the police desk in the Sixth Precinct, (*id*. at Attachment 6-20), defendants' argument is misplaced. As the court explained in *Griffin*, 2012 WL 3090295, at *12, the fact that a member of the general public would not have inside knowledge of alleged misconduct was "exactly the point," because "[s]uch speech must necessarily be protected by the First Amendment to protect the public's significant First Amendment interest in receiving information about the functioning of government, to which they otherwise would not be privy." *Id.* "Were [public employees] not able to speak on [the operation of their employers], the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *Id.* at *13 (quoting *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam) (brackets in original)); *see Garcetti*, 547 U.S. at 419 (acknowledging that "First Amendment interests . . . extend beyond the individual speaker" and recognizing "the importance of promoting the public's interest in receiving the

well-informed views of government employees engaging in civic discussion").

In summary, after careful consideration of the underlying undisputed facts, the Court concludes as a matter of law that Smith's speech to both *Newsday* and *CNN* were made in his capacity as a citizen and therefore falls within the ambit of First Amendment protection.

### (2) Adverse Employment Action

With respect to the second element, plaintiff alleges that he suffered adverse employment actions when defendants launched full-scale disciplinary investigations and proceedings into his affairs, transferred him to a lower-paying administrative position, suspended him without pay for 30 days, served him with disciplinary charges, and eventually forced him into retirement.[2]

"In the context of a First Amendment retaliation claim . . . retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks and citation omitted). "Adverse employment actions include discharge, demotion, refusal to hire, refusal to promote, and reprimand." *Kaluczky v. City of White Plains*, 57 F.3d 202, 208 (2d Cir. 1995) (citation omitted). In some circumstances, the initiation of disciplinary proceedings may be sufficient to constitute an adverse employment decision. *See Burkybile v. Bd. of Educ.,* 411 F.3d 306, 313-14 (2d Cir. 2005); *but see Joseph v. Leavitt*, 465 F.3d 87, 88-89 (2d Cir. 2006) ("an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable matter"). "This list is not exhaustive and the determination is guided by the general rule that whether an undesirable employment action qualifies as being adverse is a heavily fact-specific, contextual determination." *Kolb v.*

---

[2]At his deposition, Smith testified that he voluntarily filed retirement papers with the police department. (*Tilton Decl.*, dated June 29, 2012, Ex. 1 at 55.)

*Camilleri*, No. 02-CV-117A, 2008 WL 3049855, at *10 (W.D.N.Y. Aug. 1, 2008) (citation omitted). The alleged act of retaliation, however, "must be more than *de minimis*." *Id.*

Although the Court is unable to conclude that an ordinary individual would have been deterred from the exercise of his or her constitutional rights by all of the alleged actions, at least three of the employment actions, namely (i) the initiation of disciplinary proceedings; (ii) Smith's reassignment to an administrative position and concomitant reduction in pay; and (iii) his thirty-day suspension without pay, constitute adverse actions within this rubric, as these actions could have a deterrent effect on other police officers who wished to express and/or protest the Precinct's allegedly discriminatory policies and practices. Accordingly, the Court now turns to the crux of the analysis, that is, whether a causal connection existed between the protected speech and the adverse employment action.

### (3) Causal Connection

"To establish causation, a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167 (2d Cir. 2006) (internal quotation marks and citation omitted). While a plaintiff can establish the causal connection between the protected activity and the adverse action "indirectly, by showing that the protected activity was followed by adverse treatment, or directly by evidence of retaliatory animus," a plaintiff may not solely "rely on conclusory assertions of retaliatory motive to satisfy the causal link." *Cobb v. Pozzi,* 363 F.3d 89, 108 (2d Cir. 2004) (internal quotation marks and citation omitted). Therefore, a plaintiff must provide the Court with "some tangible proof to demonstrate that [his] version of what occurred was not imaginary." *Id.* "[W]ide-ranging speculation about what may have motivated" an employer to act is, "[w]ithout some proof in the record [of] retaliatory animus toward" the plaintiff and without "evidence to contradict [a defendants'] testimony" to the contrary, simply

insufficient to make a First Amendment retaliation claim." *Deters v. Lafuente*, 368 F.3d 185, 190 (2d Cir. 2004). Plaintiff has not proffered any direct evidence of retaliatory animus by defendants and attempts to prove causation by relying on temporal proximity.

With respect to the use of indirect proof that is based on a "showing that the protected activity was closely followed in time by the adverse . . . action," there is no bright-line rule for weighing the import of such evidence. *Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554-55 (2d Cir. 2001). The relevance of temporal proximity to establish causation in a particular First Amendment retaliation case will turn on its unique facts and circumstances. *See Smith v. Da Ros,* 777 F. Supp. 2d 340, 357 (D. Conn. 2011) (citing *Burkybile*, 411 F.3d at 314)). "Thus, mere temporal proximity – even very close temporal proximity – is not always sufficient to support an inference that the plaintiff's protected activity was a motivating factor in the defendant's adverse employment action." *Id.* (citing *Anemone*, 629 F.3d at 118). For example, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in the protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance America Corp.,* 248 F.3d 87, 95 (2d Cir. 2001); *cf. Porter v. Potter*, 366 Fed. Appx. 195, 197 (2d Cir. 2010) ("[a]dverse employment actions that are part of an extensive period of progressive discipline that begins prior to any protected activity on the plaintiff's part cannot give rise to an inference of retaliation sufficient to make out a prima facie case") (internal quotation marks and citation omitted); *see Smith,* 777 F. Supp. 2d at 357 ("mere temporal proximity between an employee's protected activity and a subsequent adverse employment action will not support an inference of a causal connection where the employer had already begun taking adverse employment actions against the employee prior to the employee's engagement in any protected activity")

Here, there is no question that Smith can show a temporal proximity between the

discovery of protected activity and the alleged adverse actions; nonetheless Smith's claim must be dismissed.  With respect to the initiation of disciplinary proceedings (and resulting suspension and reassignment), an Internal Affairs Bureau investigation into the potential misuse of a police computer by plaintiff may have occurred immediately upon the discovery of the e-mails to the news media on Smith's police computer, however, the record is clear that the investigation and disciplinary proceedings arose as a product of a previous disciplinary investigation that was already underway prior to the protected activity.  *See Hardy v. Rochester Genesee Regional Transp. Auth.,* No. 10-CV-6286 (CJS), 2012 WL 4026689, at *6 (W.D.N.Y. Sept. 12, 2012) ("temporal proximity alone does not create an inference of retaliation when the adverse action is part of, or the culmination of, a disciplinary process that was already underway prior to the protected activity").  At his deposition, Police Commissioner Richard Dormer testified that the investigation into plaintiff's misuse of the police computer originated from the pending disciplinary investigation into Smith's failure to perform his duties to be present at a refusal hearing at the DMV.  (*Tilton Decl*., dated June 29, 2012, Ex. 3 at 16.)

Moreover, the record demonstrates that before plaintiff filed his First Amendment retaliation claim, defendants had repeatedly counseled and disciplined Smith for misuse of the police computer.  The investigation underlying plaintiff's retaliation claim occurred nearly eighteen months after a previous Internal Affairs Bureau investigative report dated May 3, 2006 recommended that Smith receive "documented counseling regarding the misuse of departmental equipment and materials" in connection with the misuse of his police computer.  (*Termini Decl*., dated June 28, 2012, Ex. H.)  Notably, during his interview in connection with that investigation, Smith gave his "appreciation and acknowledgment" that his conduct was improper.  (*Id.*)  Smith also had been investigated for police computer misuse in 2000, and the investigative report dated April 17, 2001 counseled plaintiff that the MDC's computer is a "tool exclusively used to

communicate via a police network for business purposes only.  It is not a desktop computer to be configured for your personal preferences."  (*Termini Decl*., dated June 28, 2012, Ex. G.)  As a result of this investigation, Smith was issued a written directive to read and familiarize himself with Department General Order 00-17, which stated that "internet access that is made available is for Department use only," and warned that "[a]ny employee who abuses internet access privileges by accessing inappropriate sites, for other than official Department business, or using the internet for other than business-related activities" would be "subject to disciplinary action." (*Id.*, Ex. B, Attachments 17-18.)  Further, the record shows plaintiff had been previously warned about police computer misuse as far back as December 1997, when he was directed not to install, reconfigure or otherwise change any programs on the computers in the Lieutenant's Office.[3] (*Termini Decl*., dated June 28, 2012, Ex. G, Attachment 17.)   Finally, Internal Affairs utilized Smith's past history of computer misuse in 2006, 2000 and 1997 as a basis for proceeding with the disciplinary charges served upon plaintiff in this matter.  (*Id.*, Ex. B.)  In short, the facts that (i) the disciplinary proceedings into Smith's  misuse of a police computer arose out of a pending disciplinary process and (ii) the adverse actions, including his suspension and reassignment, were part of an extensive period of progressive discipline preceding plaintiff's First Amendment retaliation charge preclude reliance on temporal proximity to "make a prima facie case of retaliation."  *McGinnis v. New York Univ. Med. Ctr.,* No. 09 Civ. 6182 (RMB), 2012 WL 5512173, at *4 (S.D.N.Y. Nov. 14, 2012); *cf. Ayiloge v. City of New York,* 00 Civ. 5051 (THK), 2002 U.S. Dist. LEXIS 11807 at *39-40 (S.D.N.Y. June 27, 2002).

    To the extent that Smith argues that he demonstrated causal nexus by showing he was

---

[3]The December 12, 1997 internal correspondence to plaintiff informing him not to change any programs on the police computers was noted in the April 17, 2001 investigative report. (*Termini Decl*., dated June 28, 2012, Ex. G, Attachment 17.)

"singled out" for disciplinary action because (i) "other officers violated departmental policy and were not disciplined under said policy except in one rare circumstance where an officer was engaged in an activity that likely amounted to a crime;" (ii) defendants were aware of other officers violating the policy; and (iii) plaintiff's supervisors told him to ignore the policy and not discipline his own subordinates for violating the policy, plaintiff's argument fails. Plaintiff has not produced evidentiary proof in admissible form that any similarly-situated police officer committed similar infractions and was not disciplined. *Cf. Smith v. Da Ros,* 777 F. Supp. 2d 340, 364-65 (D. Conn. 2011). At most, at his deposition, Smith testified in conclusory fashion as follows that while he was aware that other police officers were suspended 30 days without pay upon service of disciplinary charges, he could not see why it should have been applied to him:

> Q:  You are aware that when someone is served with Section 75 charges that someone can be suspended pending the termination of that hearing, you're aware of that?
> A:  That's normally reserved for psychotics and drunks and people that are a danger to the police. People that should be immediately separated from their gun and their badge because there is some doubt as to their continued safe operation as a police officer.
> Q:  You're unaware of any other policeman ever being suspended 30 days without pay upon service of charges?
> A:  No. I'm aware of many but usually for reasons that were – it was to serve a purpose. This person either had a psychological problem or alcohol or drug problem and should not be around a gun or a badge. Yes. But I don't see how it applied to me. I still had access to computers. It was kind of silly, actually. What would it possibly accomplish to suspend me for 30 days?

(*Tilton Decl.*, dated June 29, 2012, Ex. 1 at 55.) Plaintiff's assertions of a retaliatory motive without more fail to satisfy the causal link. *Kelly,* 2012 WL 1077677, at *17 ("a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. Instead, he must produce some tangible proof to demonstrate that [his] version of what occurred was not imaginary") (internal quotation marks and citations omitted).

With respect to plaintiff's suspension, there is record evidence that defendants suspended Smith and removed him from a supervisory position because plaintiff continued to misuse the

police computer despite having been previously investigated and counseled for the inappropriate use of the computer, including sending an e-mail with "curse words," and because of the amount of time he was spending on non-police business during his scheduled work hours. Indeed, an examination of the thirty-two additional disciplinary charges served on plaintiff on February 7, 2008 reveals that only nine of the charges related to Smith's expression of First Amendment issues. The majority of the charges, *viz*. twenty-three of the thirty-two disciplinary charges, concerned plaintiff's extensive misuse of the police computer for personal and non-police business and had nothing to do with First Amendment expression. Plaintiff's continued personal misuse of the computer provided the overwhelming basis for the charges, suspension and removal from a supervisory position.

For example, Deputy Police Commissioner Roger Shannon testified at this deposition as follows:

A: . . . after he was aware that the investigation was going on he continued to write inappropriate e-mails.
Q: What does that mean, inappropriate e-mails?

A: If I remember, he wrote an e-mail with several curse words in it describing the process that was going on.
Q: To who?
A: I don't know. I don't remember.
* * * * * * * * * * * * *
Q: Other than the one e-mail where he used curse words, anything else that you considered to be of a necessity to suspend him immediately?
A: I think it was the totality of the situation. The fact that we found out he was spending a whole lot of time on business other than police department. . . .

(*Termini Decl.,* dated July 12, 2012, Ex. O at 87.)

Deputy Police Commissioner Shannon further testified as follows:

A: I don't remember. I would have to actually see the e-mail. I never considered him disrespectful to me.
Q: That had no bearing on this at all?
A: The only bearing it had was that it was continuing. In spite of being investigated for the inappropriate use of the computer, he continued to inappropriately use it.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Q:    . . . you felt it was inappropriate for him to continue to do it?
A:    Yes.
Q:    That is one of the reasons why you are saying that you suspended him?
A:    Yes.
Q:    But you never told him not to?
A:    I never told him not to, no.
Q:    You never directed anybody to tell him not to?
A:    One would think that if you have risen to the job of police lieutenant, which is not all that easy to obtain, and one has gotten a law degree . . . .

(*Tilton Decl.*, dated June 29, 2012, Ex. 2 at 89-90.)

In addition, Police Commissioner Richard Dormer testified as follows:

Q:    Are you aware that Lieutenant Smith was suspended?
A:    Yes.
Q:    He was suspended for 30 days without pay, is that correct?
A:    Yes.
Q:    Whose decision was that?
A:    I make the ultimate decision, as the head of the department, I made the ultimate decision. It was based on the information that Deputy Commissioner Shannon gave me about not discontinuing this activity.
Q:    Did you as Deputy Commissioner Shannon if anyone ever told Lieutenant Smith to discontinue the activity?
A:    No. I didn't ask him that. As a lieutenant, as a high ranking officer in the department, I think that . . . .

(*Id*. at Ex. 3 at 34.)

Finally, with respect to plaintiff's reassignment, there is record evidence that Deputy Commissioner Shannon determined that Smith should be removed from a supervisory position since the plaintiff had previous warnings concerning the misuse of the police computer.

(*Termini Decl.,* dated July 12, 2012, ¶¶ 34-35.)[4]

In summary, because plaintiff has not come forward with evidence, direct or indirect, to raise a question of material fact as to the causal connection between the Smith's protected speech and the adverse employment actions, he has failed to establish a prima facie case of First

---

[4]The Court notes that defendants refer to Exhibit O at page 85 lines 11-24, but have not attached this page to the Declaration.

Amendment retaliation.[5]  Despite plaintiff's attempts to argue to the contrary, this Court

concludes that even construing the evidence most favorably to plaintiff, no rational jury could

find a causal connection between the adverse employment actions and Smith's protected speech,

as the only reasonable inference to be drawn from the record is that Smith's continued misuse of

his police computer was the basis for the disciplinary proceedings, suspension and reassignment

in this matter.[6]  Accordingly, because the evidence plaintiff has proffered would be insufficient

to permit a rational finder of fact to infer a retaliatory motive, this Court concludes that

---

[5]Additionally, "[q]ualified immunity protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007) (internal quotation marks and citation omitted); *see Robison v. Via*, 821 F.2d 913, 920 (2d Cir. 1987) (police officers "enjoy a qualified immunity from suit under § 1983 for investigative acts").  In the context of a summary judgment motion, the relevant standard is whether "no reasonably jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Id.* at 921 (internal editing omitted); *see Milfort v. Prevet*, No. 10-CV-4467, 2013 WL 519041, at *4 (E.D.N.Y. Feb. 13, 2013) (same).  The record is simply devoid of any evidence supporting Smith's claim that he was disciplined for reasons other than violating departmental policy with respect to computer usage. That is to say, because no reasonable jury could conclude that it was objectively unreasonable for defendants to believe that they were acting in a fashion that did not clearly violate an established federally protected right, qualified immunity provides an additional ground for granting defendants' summary judgment motion. *See Garcia*, 2013 WL 309981, at *9.

[6]Although the Court need not reach this issue, even if plaintiff had satisfied his initial burden, Smith's history of continued and extensive misuse of the Department's computer for personal and non-police business would likely be sufficient to grant defendants' motion for summary judgment on the ground that defendants would have initiated the disciplinary proceedings, suspension and removal of Smith from a supervisory position even if he had not sent the media e-mails to *Newsday* and *CNN*.  *Diesel v. Town of Lewisboro*, 232 F.3d 92, 107 (2d Cir. 2000) (holding that if a plaintiff establishes a prima facie claim for First Amendment retaliation, "a defendant may avoid liability by showing 'by a preponderance of the evidence that it would have reached the same decision as to the [employment action] even in the absence of the protected conduct'") (quoting *Mount Healthy*, 429 U.S. at 287)). Smith fails to proffer any evidence of retaliatory motive other than temporal proximity which fails to meet his burden. *Cf. Desardouin v. City of Rochester*, 2013 WL 599473, at *3 (2d Cir. Feb. 19, 2013).

defendants' motion for summary judgment must succeed.

**C.      State Law Claim**

The "traditional values of judicial economy, convenience, fairness and comity weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated." *Kolari v. New York Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (internal quotation marks and citation omitted).  Because the Court grants defendants' motion for summary judgment on all of plaintiff's federal claims, it declines to exercise supplemental jurisdiction over his state law claims.  See 28 U.S.C. § 1367(c); *Kolari*, 455 F.3d at 122 (holding a court may decline to exercise supplemental jurisdiction when the court has dismissed all claims over which it has original jurisdiction).

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted with respect to plaintiff's federal claim.  Plaintiff's state law claim is dismissed without prejudice to renewal in state court.  Plaintiff's motion for partial summary judgment is denied.  The Clerk of the Court is directed to enter judgment for defendants on plaintiff's federal claim and to close this case.

**SO ORDERED.**

Dated:          Central Islip, New York
                February 27, 2013

                                _____/s/_____
                                ARLENE R. LINDSAY
                                United States Magistrate Judge